**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| CAPTAIN VAN DYKE TRUST, | Case No. 8:10-bk-14973-KRM |
| TREASURE CHEST, LLC, | Case No. 8:10-bk-14976-KRM |
| Debtors. | **(Jointly Administered under Case No. 8:10-bk-14976-KRM)** |
| _____ / | |

**MOTION OF ISTAR FM LOANS LLC FOR ORDER
DISMISSING THE DEBTORS' CHAPTER 11 CASES**

iStar FM Loans LLC ("iStar"), the prepetition senior, secured lender to the above-captioned debtors and debtors-in-possession (the "Debtors"), hereby moves this Court for entry of an order dismissing the Debtors' chapter 11 cases for cause under 11 U.S.C. § 1112(b) (the "Motion"). In support of this Motion, iStar states as follows:

**Preliminary Statement**

1. The Debtors' bankruptcy filings are textbook examples of cases meriting dismissal. Specifically, the Debtors are single-asset, special purpose entities that (i) have no employees, (ii) have only one material asset, (iii) have one principal secured creditor whose claim exceeds the value of the debtors' property, (iv) are engaged in a two-party dispute with the secured creditor, which dispute can be resolved by the pending foreclosure sale of the Real Property as defined below, (v) filed bankruptcy petitions hours before the scheduled foreclosure sale as a last-ditch effort to delay the foreclosure sale and to retain control of the Real Property and (vi) have no ability to reorganize.

2. The Debtors' sole purpose in filing the petitions was to delay the foreclosure sale. The foreclosure sale was scheduled by a Florida state court in the foreclosure action that iStar

commenced in early 2009 after the Debtors failed to make the required payments under the iStar loan documents.  On May 25, 2010, the Florida state court entered an order in favor of iStar (i) declaring iStar's lien against the Real Property senior to all other liens, (ii) finding that as of May 17, 2010, $31,339,831.40 was due and owing to iStar, and (iii) scheduling a foreclosure sale for June 24, 2010 at 2:00 p.m.

3. The timing of the Debtors' filings alone demonstrates that the Debtors are using the chapter 11 process and the judicial system to thwart the sale and loss of control of the Real Property.  When coupled with the following additional facts, cause for dismissing the Debtors' cases is beyond question: (i) the Debtors offer no justification or basis for their unrealistically high valuation of the Real Property, but rather a realistic capitalization rate yields a value of the Real Property of at least $2,400,000 less than the iStar indebtedness, (ii) notwithstanding extensive searching for refinancing, the Debtors have failed to obtain financing commitments in an amount even close to sufficient to satisfy the iStar indebtedness, (iii) the Debtors have no material assets other than the Real Property and the rents received from the Real Property, which are fully encumbered by iStar's liens and which are insufficient to satisfy their outstanding indebtedness and obligations to iStar, which matured on September 1, 2009 and were reduced to judgment on May 25, 2010, and (iv) the Debtors allege that the property is 100% leased and can still not hope to satisfy their obligations to iStar.

4. In the end, this is an overleveraged real estate project, one in which its secured lender has granted more than enough time and extensions to refinance, but that must now be turned over to the secured lender.  Given these compelling circumstances and in the interests of the parties involved, this Court should immediately dismiss the Debtors' chapter 11 cases.

**Jurisdiction and Venue**

5. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

6. This is a core proceeding within the meaning of 11 U.S.C. § 157(b)(2)(G).

7. The statutory predicates for the relief requested herein are Section 1112 of the United States Bankruptcy Code (11 U.S.C. §§ 101 et seq.) (the "Bankruptcy Code") and Rules 1017 and 9014 of the Federal Rules of Bankruptcy Procedure.

**Background**

**A.  The Debtors.**

8. The Captain Van Dyke Trust is a single-purpose entity whose sole purpose is to hold and develop the real property located at 17623 – 17695 N. Dale Mabry Highway, Lutz, Florida (the "Real Property"), on which an approximately 137,000 square foot retail shopping center was constructed in 2007. iStar agreed to provide short-term financing to the Debtors and their affiliates on this basis, and both the loan documents and the organizational documents of the Captain Van Dyke Trust and its beneficiaries were specifically designed to preserve the Captain Van Dyke Trust as a single-asset, special-purpose entity with no other business. Consistent with the Captain Van Dyke Trust's sole purpose of holding and developing the Real Property, it has no employees. (See Joint Chapter 11 Case Mgmt. Summ. at 7.)

9. Treasure Chest, LLC is a beneficiary of the Captain Van Dyke Trust. As detailed in Treasure Chest's schedules, Treasure Chest has no assets, other than its interest in the Captain Van Dyke Trust, and only one creditor, iStar.

**B.  iStar's Loans and the Mortgage.**

10. The Debtors are borrowers under the Loan and Security Agreement dated as of May 31, 2006 (as amended, restated, supplemented, or otherwise modified from time to time, the

"Credit Agreement"), by and among Fremont Investment & Loan ("Fremont"), Clark D. East, as trustee of the Captain Van Dyke Trust, Gold Doubloons, LLC, Black Beard, LLC, and Treasure Chest, LLC (the "Borrowers").

11. The Borrowers also executed a secured promissory note in the amount of $28,628,000.00 (as amended, restated, supplemented, replaced or otherwise modified, the "Note"), which was originally scheduled to mature on June 1, 2008. As evidenced by the two-year term, the financing was intended to be a short-term loan to finance the development of the Real Property. The Note was subsequently amended to extend the maturity date to October 1, 2008 and then amended a second time to extend the maturity date to September 1, 2009. The principal balance of the Note was also reduced to $26,281,091.52.

12. To secure repayment of the Debtors' indebtedness under the Credit Agreement, the Note, and related documents and agreements, the Debtors granted to iStar security interests in and liens upon substantially all of the Debtors' real and personal property pursuant to, and as detailed in, (i) the Credit Agreement, (ii) that certain Mortgage and Fixture Filing dated as of May 2006 (as amended, restated, supplemented, or otherwise modified from time to time, the "Mortgage"), by the Borrowers in favor of Fremont, and (iii) that certain Assignment of Rents (and Leases) dated as of May 2006 (as amended, restated, supplemented, or otherwise modified from time to time, the "Assignment of Rents"), by Borrowers in favor of Fremont.

13. On or about June 29, 2007, Fremont assigned to iStar the Credit Agreement, the Note, the Mortgage, the Assignment of Rents, and related documents evidencing the Borrowers' indebtedness and obligations and the liens and security interests granted by the Borrowers.

14. Fremont, and iStar as the assignee of Fremont, perfected their security interests in the Borrowers' real and personal property by filing Uniform Commercial Code financing

statements, fixture filings, the Mortgage, and the Assignment of Rents in the appropriate jurisdictions.

15. True and accurate copies of the Credit Agreement, the Note, the Mortgage, and the Assignment of Rents are included in the *Appendix to the Motion of iStar FM Loans for Order Dismissing the Debtors' Chapter 11 Cases* (the "Appendix"), which was filed contemporaneously herewith and are incorporated herein by reference.

**D.    The Foreclosure Action.**

16. On February 20, 2009, iStar sent a default notice to the Borrowers after they failed to make the required payments under the Credit Agreement and the Note.[1] With no change in the status quo, iStar commenced a foreclosure action on or about March 26, 2009 by filing a Complaint for Mortgage Foreclosure (the "Foreclosure Action") with the Circuit Court of the Thirteenth Judicial Circuit in and for Hillsborough County, Florida (the "Florida Circuit Court") seeking to foreclose its interests in the Real Property under the Mortgage, to foreclose its security interests in the Debtors' personal property, and to exercise its rights under the Assignment of Rents.

17. Following iStar's request that the Florida Circuit Court enter an order directing the deposit of rents with the court registry, iStar and the Borrowers agreed that the property manager would deposit with the Florida Circuit Court Registry on a monthly basis the net cash flow from the Real Property for such month. The Florida Circuit Court entered an order memorializing iStar's and the Borrowers' agreement on May 22, 2009, a true and correct copy of which is attached hereto as Exhibit A.

---

[1] While the foreclosure action was pending, the September 1, 2009 maturity date came and went with no payment or meaningful restructuring proposal by the Borrowers, giving rise to yet another default under the Credit Agreement, the Note, and related loan documents.

18. That same day, the Captain Van Dyke Trust provided a $100,000 retainer to their current bankruptcy counsel representing the Debtors in these cases. (See Captain Van Dyke Trust Sch. A., Ex. 3B.)

19. On February 18, 2010, iStar filed an Amended Motion for Summary Final Judgment with the Florida Circuit Court.

20. On May 25, 2010, the Florida Circuit Court granted iStar's Amended Motion for Summary Final Judgment (the "Foreclosure Order"). A true and correct copy of the Foreclosure Order is attached hereto as Exhibit B. As detailed in the Foreclosure Order:

- The aggregate outstanding indebtedness owed by the Borrowers to iStar as of May 17, 2010 was $31,339,831.40 (the "Outstanding Indebtedness").[2] (Foreclosure Order ¶ 3.)

- The Outstanding Indebtedness would accrue interest from and after May 17, 2010 at a rate of 6.0% per annum (such accrued interest and all other interest, fees, costs, and expenses accrued or incurred through the Petition Date and not otherwise included in the Outstanding Indebtedness, together with the Outstanding Indebtedness, the "Prepetition Indebtedness"). (Id. ¶ 4.)

- iStar has a lien for the Outstanding Indebtedness, which encumbers the Real Property. (Id. ¶ 5.)

- iStar's lien on the Real Property is superior in dignity to any right, title, interest, or claim of the Borrowers and the other defendants named in the foreclosure complaint. (Id. ¶ 5.)

21. A public sale of the Real Property was scheduled for June 24, 2010, at 2:00 p.m., at which time the Clerk of the Florida Circuit Court was going to sell the Real Property to the highest bidder. (Id. ¶ 6.)

---

[2] The Outstanding Indebtedness is comprised of: (i) $26,238,339.59 in principal, (ii) $2,340,789.28 in interest through May 17, 2010, (iii) $2,623,833.96 in late fees with respect to the outstanding principal amount, (iv) $12,442.60 in late charges with respect to the exit fee, and (v) $124,425.97, which represents a contractual exit fee.

22. Accordingly, iStar has valid, first priority, perfected, and not otherwise avoidable security interests in the Real Property and substantially all of the Debtors' personal property, as more fully described in the Foreclosure Order, the Credit Agreement, the Note, the Mortgage, the Assignment of Rents, and related documents and agreements.

**E.    The Chapter 11 Filings.**

23. On June 23, 2010 (the "Petition Date"), hours before the Florida Circuit Court's scheduled sale of the Real Property, the Debtors filed their petitions under chapter 11 the Bankruptcy Code.

24. As of May 17, 2010, the Debtors were indebted to iStar in the approximate amount of $31,339,831.40, which amount is exclusive of post-petition interest, costs, and expenses, including attorneys fees. (Foreclosure Order ¶ 3.)

25. On July 19, 2010, the Debtors filed their separate Schedules and Statements of Financial Affairs (the "Schedules").

26. On August 2, 2010, Clark East, as trustee of the Captain Van Dyke Trust and sole member of Treasure Chest, LLC, testified under oath at the meeting of creditors, pursuant to section 341 of the Bankruptcy Code (the "341 Meeting").

**F.    The Debtors Lack Equity and Have No Unencumbered Assets to Pay Creditors.**

27. The Debtors' Schedules assert that they have assets totaling $34,072,649.33 and liabilities of $31,963,661.65. The Debtors' sole material asset is the Real Property, the market value of which the Debtors assert is $32,981,888.00. (Captain Van Dyke Sch. A.) The Debtors base their valuation of the Real Property not on an appraisal conducted by an independent, experienced third party, but rather on a formulaic capitalization rate approach, the accuracy of which is dependant upon the use of an appropriate capitalization rate, calculated by the Debtors

themselves. The capitalization rate approach estimates the value of the property by capitalizing the income of the property, ultimately determining the amount an investor would be willing to invest in return for a specific stream of income. Sill Corp. v. United States, 343 F.2d 411, 417 (10th Cir. 1965). Under this approach, the value of the property is the quotient of the net operating income of the property divided by the capitalization rate. Even assuming that the use of the capitalization rate approach is appropriate, the Debtors fail to provide any valid explanation or basis (i) to justify the use of a 7.0% capitalization rate or (ii) for the Debtors' estimated net operating income—including which items were included and excluded in determining the net operating income. In fact, at the 341 Meeting, East admitted that he did not rely on any professional opinion for the 7.0% number.

28. The "determination of a capitalization rate is a most sophisticated exercise of judgment." Fernandes Realty Corp. v. Lagace, 401 A.2d 43, 46 (R.I. 1979). The Debtors concede that determining the appropriate capitalization rate is a formidable task, stating that capitalization rates "are a function of the quality of the asset, the location, age, tenant mix, and the credit of the tenants" and can "vary based on financing availability for a particular market and product." (Captain Van Dyke Attach. to Sch. A.) Yet they fail to explain whether and how any of those factors (or any other factors) were considered in selecting their 7.0% capitalization rate.

29. The lack of any support for the Debtors' capitalization rate coupled with the fact that a 7.0% capitalization rate conveniently yields a market value that exceeds iStar's secured claim leads to the conclusion that the proposed 7.0% capitalization rate is inappropriate. From the Debtors' own calculations, even a slightly higher capitalization rate would wipe out the

Debtors' alleged equity cushion. For example, a capitalization rate of 7.5% yields a market value of only $30,783,093.00.

30. Moreover, taken at face value and without reviewing comparables and taking into consideration the quality of the Real Property and other factors bearing on the Real Property, which would be appropriate in any analysis, the Wall Street Journal on January 27, 2010 reported that capitalization rates had reach a 6 ½ year high of 8.8% in December 2009 for office properties in central business districts. See In Brief – Cap Rates Reach 6 ½-Year High, Wall St. J. Abstrs., Jan. 27, 2010, at C8. Although the same capitalization rates moved closer to 7.50% in March, it is clear that the capitalization rates in the current economy have increased substantially and are highly volatile. In Brief – Capitalization Rates Retreated in March, Wall St. J. Abstrs., Apr. 28, 2010, at C9. That fact alone reveals that a 7.0% capitalization rate for a shopping center that is not even located in a central business district is inappropriate. Moreover, given that the Debtors have failed to locate financing sufficient to satisfy the iStar indebtedness, logic dictates an even higher capitalization rate.

31. With regard to the Debtors' personal property, it is not plausible for the Debtors to allege that they have $1,090,761.33 in personal property assets. As conceded by the Debtors in the Capitan Van Dyke Trust Schedule B, (a) $761,961.47 of the alleged personal property is comprised of tenant accounts receivable that are largely uncollectible and (b) $29,943.83 represents security deposits in which Captain Van Dyke has only a contingent interest. It defies reason to include as income security deposit in which the Debtors have only a contingent interest where their lender would not even rely on such deposits as collateral.

32. Accordingly, although the Debtors' summary of schedules indicates that they have assets of $34,072,649.33 and liabilities of only $31,963,661.65, by utilizing a more realistic

capitalization rate of at least 8.0%[3] and by properly excluding the tenant accounts receivable and security deposits, the Debtor's liabilities ($31,963,661.65) exceed their assets ($29,158,006.60) by at least $2,805,655.65.

### G. The Debtors Have No Refinancing Options.

33. As noted above, the iStar loan was intended as a bridge loan to develop the Real Property. With a short maturity, it was contemplated that the Debtors would refinance the loan following the development of the Real Property. Notwithstanding over two years of searching for refinancing since the original maturity date, the Debtors have failed in every attempt to obtain refinancing in an amount even close to the iStar indebtedness. At the 341 Meeting, East admitted that the Debtors have only received interest from one lender at a value approximately $15,000,000 below the scheduled value of the Real Property.

34. With the iStar indebtedness due and payable in full and without any refinancing options, it is clear that the Debtors have no reasonable likelihood of rehabilitation.

## Relief Requested

### The Debtors' Cases Should be Dismissed

35. iStar submits that this Court should promptly dismiss the Debtors' chapter 11 cases, which were filed solely to stall the foreclosure sale and frustrate iStar's efforts to exercise its remedies with respect to the Real Property. As detailed above, the Debtors have no equity in the Real Property and no reasonable prospects for reorganization.

36. Where a debtor is a single-asset, special purpose entity whose financial problems arise solely from a dispute with its secured lender and the debtor files a petition under the Bankruptcy Code shortly before a foreclosure sale or the commencement of a foreclosure

---

[3] An appraisal by a trained and qualified appraiser would likely result in a higher capitalization rate and an even lower valuation of the Real Property.

proceeding, the Eleventh Circuit, as well as courts within this district, have found cause to dismiss a case under section 1112(b) of the Bankruptcy Code. See State St. Houses, Inc. v. N.Y. State Urban Dev. Corp. (In re State St. Houses, Inc.), 356 F.3d 1345, 1346–47 (11th Cir. 2004); Phoenix Piccadilly, Ltd. v. Life Ins. Co. of Va. (In re Phoenix Piccadilly, Ltd.), 849 F.2d 1393, 1394–95 (11th Cir. 1988); Natural Land Corp. v. Baker Farms, Inc. (In re Natural Land Corp.), 825 F.2d 296, 297–99 (11th Cir. 1987); Albany Partners, Ltd. v. Westbrook (In re Albany Partners, Ltd.), 749 F.2d 670, 674 (11th Cir. 1984); Colonial Daytona Ltd. P'ship v. Am. Sav. of Fla., F.S.B., 152 B.R. 996 (M.D. Fla. 1993); In re Sar-Manco, Inc., 70 B.R. 132, 136–37 (Bankr. M.D. Fla. 1986). The dismissal of such single-asset, special purpose entity cases "prevents abuse of the bankruptcy process." Colonial Daytona, 152 B.R. at 1005 (quoting Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.), 779 F.2d 1068, 1072 (5th Cir. 1986)).

37. The Eleventh Circuit and courts in this district have routinely dismissed cases where:

> (1) the debtor has only one asset; (2) the debtor has few unsecured creditors whose claims are small in relation to the claims of the secured creditors; (3) the debtor has few employees; (4) the property is subject of a foreclosure action as a result of arrearages on the debt; (5) the debtor's financial problems involve essentially a dispute between the debtor and the secured creditor which can be resolved in the pending state court action; and (6) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights.

In re Phoenix Piccadilly, Ltd., 849 F.2d at 1934–95 (citing Albany Partners, 749 F.2d at 674); see also State St. Houses, 356 F.3d 1345 (upholding the Piccadilly and Albany Partners factors as appropriate guidelines for evaluating whether to dismiss chapter 11 petitions in single-asset real estate cases).

### A. All of the <u>Piccadilly</u> Factors Are Present.

38. The record in these proceedings will demonstrate the presence of all of the <u>Piccadilly</u> factors and, therefore, a strong showing that the Debtors' cases should be dismissed.

- <u>First</u>, the Debtors have only one material asset, the Real Property. While the Debtors claim that the fair market value of the Real Property is $32,981,888.00, their valuation approach is not supported by an actual appraisal and is otherwise unsubstantiated. Moreover, assuming the capitalization rate approach is appropriate in this circumstance, using the Debtors' own net operating income and a more realistic capitalization rate of 8.0% given the current real estate market, the fair market value of the Real Property drops to $28,859,150. An appraisal by an independent, experienced third party appraiser would likely yield an even higher capitalization rate and a lower fair market value.

- <u>Second</u>, iStar is the Debtors' only secured creditor of consequence. In fact, combined, the Debtors' other secured and unsecured creditors hold claims of only $623,830.25, of which $500,000 constitutes loans to the Debtors by an insider. The other creditors' claims pale in relation to iStar's at least $31,339,831.40 claim.

- <u>Third</u>, the Debtors have no employees. (<u>See</u> Joint Chapter 11 Case Mgmt. Summ. at 7.)

- <u>Fourth</u>, as of the Petition Date, the Florida Circuit Court had entered the Foreclosure Order and the Real Property was scheduled to be sold at 2:00 p.m. the next day.

- <u>Fifth</u>, it is clear from the circumstances of this bankruptcy filing, as well as the Debtors' own petitions and Schedules, that the Debtors' financial problems are

related solely to a dispute with one secured creditor, iStar. That two-party dispute had already been resolved by the Florida Circuit Court.

- <u>Sixth</u>, based on all available evidence, particularly the timing of the filing, it would strain credulity for the Debtors to now claim that their chapter 11 cases were filed for any purpose other than to delay the sale of the Real Property pursuant to the Foreclosure Order.

39. The foregoing facts of the Debtors' filings demonstrate a textbook example of a case meriting dismissal: (i) the Debtors' financial woes arise from a two-party dispute, which has already been resolved outside the bankruptcy court's jurisdiction, and (ii) the purpose of the bankruptcy filings was to delay and frustrate the Debtors' secured lender's foreclosure sale. Under such circumstances, courts routinely dismiss a case under Section 1112(b) of the Bankruptcy Code. <u>See supra</u> ¶¶ 35-36. Accordingly, this Court should act to preserve the integrity of the bankruptcy process and dismiss the Debtors' cases so that the Florida Circuit Court can enforce its Foreclosure Order and proceed with the sale of the Real Property.

**B.     The Debtors Cannot Demonstrate a Reasonable Need, Expectation, or Ability to Reorganize.**

40. In connection with applying the factors from <u>Piccadilly</u>, some courts have emphasized the purpose of the reorganization process. <u>See, e.g.</u>, <u>In re Sar-Manco</u>, 70 B.R. at 137–39 (string citation and case narratives). In <u>Sar-Manco</u>, the court opined:

> Particularly when there is no realistic possibility of an effective reorganization and it is evident that the debtor seeks merely to delay or frustrate the legitimate efforts of secured creditors to enforce their rights, dismissal of the petition . . . is appropriate.

<u>Id.</u> at 137.

41. The fundamental problem with any restructuring proposed by the Debtors is that there are no assets available to pay any creditors other than iStar. As revealed by the Debtors' schedules, the Debtors sole material asset is the Real Property, which is fully encumbered by iStar's lien. iStar's Mortgage extends to all personal property related to the Real Property and iStar's Assignment of Rent covers the alleged outstanding accounts receivable. Moreover, the Debtors also granted iStar a security interest in substantially all of their personal property.

42. Even if the Debtors can demonstrate that they have equity in the property or there is a potential for a successful reorganization, the Eleventh Circuit has made clear that the cases should still be dismissed. See Phoenix Piccadilly, 849 F.2d at 1395 ("We reject the debtor's argument that the bankruptcy court cannot ever dismiss a case for bad faith if there is equity in the property because the presence of equity indicates the potential for successful reorganization."). As stressed by the Eleventh Circuit in In re Phoenix Piccadilly, if cause exists to dismiss a debtor's case, such cause necessarily taints any reorganization proposal rendering such proposal unconfirmable under Section 1129 of the Bankruptcy Code. Id. (quoting Natural Land Corp. v. Baker Farms, Inc. (In re Natural Land Corp.), 825 F.2d 296, 298 (11th Cir. 1987)).

43. In the end, these chapter 11 cases are nothing more than a two-party dispute between the Debtors and their secured lender, a dispute that had been resolved in the proper forum, the Florida Circuit Court. The Debtors' filing of their petitions within hours of the scheduled sale of the Real Property was completed to hinder the finalization of iStar's foreclosure of the Mortgage and to impede the sale of the Real Property. Accordingly, the Court should dismiss the Debtors' cases.

**WHEREFORE**, iStar respectfully requests the Court to enter an order (i) dismissing the Debtors' chapter 11 cases and (ii) granting any other relief that is fair and just.

Dated this 2nd day of August, 2010.

/s/ *Suzy Tate*
David S. Jennis
Florida Bar No. 775940
Suzy Tate
Florida Bar No. 22071
Jennis & Bowen, P.L.
400 North Ashley Drive, Suite 2540
Tampa, Florida 33602
Phone: 813-229-1700
Fax: 813-229-1707

/s/ *Peter A. Siddiqui*
Peter A. Siddiqui
Karin H. Berg
Katten Muchin Rosenman LLP
525 W. Monroe Street
Chicago, IL 60661
Phone: 312-902-5623
Fax: 312-902-1061

*Co-Counsel for iStar FM Loan, LLC.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Motion has been furnished, by electronic service and/or U.S. Mail, postage prepaid to the **United States Trustee**, 501 E. Polk St., Ste 1200, Tampa, FL 33602; **Russell M. Blain** and **Stephen R. Leslie**, 110 Madison Street, Suite 200, Tampa, FL 33602; **Debtor, Captain Van Dyke Trust,** c/o Clark D. East, Trustee, 10901 Corporate Circle North, Suite A, St. Petersburg, FL 33706; **Debtor, Treasure Chest, LLC,** c/o Clark D. East, 10901 Corporate Circle North, Suite A, St. Petersburg, FL 33706; and to those parties receiving electronic notices via this Court's CM/ECF system on this 2nd day of August, 2010.

/s/ *Suzy Tate*
Suzy Tate