# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| CAPTAIN VAN DYKE TRUST, | Case No. 8:10-bk-14973-KRM |
| TREASURE CHEST, LLC, | Case No. 8:10-bk-14976-KRM |
| Debtors. | **(Jointly Administered under Case No. 8:10-bk-14973-KRM)** |

_____/

## OBJECTION OF iSTAR FM LOANS LLC TO DEBTORS' DISCLOSURE STATEMENT AND PLAN OF REORGANIZATION

iStar FM Loans LLC ("iStar"), the prepetition senior, secured lender to the above-captioned debtors and debtors-in-possession (the "Debtors"), hereby submits this Objection (this "Objection") to (i) the Debtors' Disclosure Statement for Plan of Reorganization Under Chapter 11 of the United States Bankruptcy Code (the "Disclosure Statement") [Doc. No. 79] and (ii) the Debtors' Plan of Reorganization Under Chapter 11 of the United States Bankruptcy Code (the "Plan") [Doc. Nos. 78 and 89]. In support of this Objection, iStar states as follows:

## I. PRELIMINARY STATEMENT

1. Following entry of a foreclosure judgment and only hours before the state court's scheduled sale of the Debtors' sole asset—a shopping center in Lutz, Florida—the Debtors commenced these bankruptcy cases in a last-ditch effort to stave off the foreclosure and retain control of the real property. As evidenced from the circumstances of the Debtors' bankruptcy filings as well as their petitions and schedules, the Debtors' financial problems stem solely from a two-party dispute with iStar, which dispute had already been resolved by the Florida state court.

2. Consistent with the Debtors' motive in commencing these cases, the Debtors' Plan is a blatant attempt by the Debtors' equity holders to retain ownership of the shopping

center while stripping iStar of its rights under a bargained-for secured loan that matured over nine months before the petition date and was reduced to judgment weeks before the filing. Not surprisingly, the Plan and Disclosure Statement run afoul of numerous provisions of sections 1125 and 1129 of the Bankruptcy Code.

3.     As further detailed below, the Disclosure Statement should not be approved because it does not contain adequate information to allow a reasonable investor to make informed judgments about the Plan. Specifically, the Disclosure Statement, among other things, fails to (i) adequately describe the Debtors' assets and the value of those assets; (ii) disclose whether the Debtors will pursue any avoidance actions; (iii) provide adequate information regarding the Debtors' equity offering under the Plan; (iv) adequately describe the risks and assumptions upon which the success of the Plan is based; (v) provide anything close to an adequate liquidation analysis; (vi) describe the claims against the Debtors adequately; and (vii) provide adequate information regarding tax issues. Accordingly, as detailed below, the Disclosure Statement should not be approved on a final basis.

4.     The Debtors' Plan is no better. Indeed, the Plan is fatally flawed and not confirmable under section 1129(a) of the Bankruptcy Code for multiple reasons, including (i) it does not comply with the applicable provisions of the Bankruptcy Code in violation of section 1129(a)(1); (ii) it was not proposed in good faith in violation of section 1129(a); (iii) it is not in the best interest of creditors in violation of section 1129(a)(7) because iStar's secured claim would receive more in a chapter 7 liquidation than under the Plan; (iv) it will not be accepted by each class of impaired claims in violation of section 1129(a)(8); and (v) it is not feasible in violation of section 1129(a)(11).

5. Even if the Plan did comply with all of the subsections of section 1129(a) other than section 1129(a)(8), it still would not be confirmable under section 1129(b) because it does not provide iStar with the present value of its claim and because it violates the absolute priority rule.

6. For these reasons, which are more fully detailed below, the Debtors' Disclosure Statement should not be approved on a final basis and the Debtors' Plan should not be confirmed.

## II. BACKGROUND

7. The Court is well aware of the background of these cases, including the two-party dispute between the Debtors and iStar that brought about these cases and that has continued since their commencement. That background was described by iStar in its *Motion for Order Dismissing the Debtors' Chapter 11 Cases* [Doc. No. 41] and its *Motion for Relief from the Automatic Stay* [Doc. No. 60].

## III. BASES FOR OBJECTION

8. The purpose and culmination of a bankruptcy proceeding commenced under chapter 11 of the Bankruptcy Code is to confirm a plan of reorganization. Although the statutory goal of a chapter 11 case is to confirm a plan, an equally important goal of the Bankruptcy Code is to protect the rights and interests of creditors. In furtherance of that goal, the Bankruptcy Code contains strict requirements that both a plan of reorganization and a disclosure statement must meet in order for the debtor to successfully reorganize. The Debtors' Disclosure Statement and Plan, however, run roughshod over those requirements, rendering the Disclosure Statement unapprovable and the Plan patently unconfirmable.

**A.    The Debtors' Disclosure Statement Fails to Provide Adequate Information and Cannot Be Approved on a Final Basis.**

9.    The Debtors' Disclosure Statement is fatally flawed.  It does not contain adequate information to allow a reasonable investor to make informed judgments about the Plan.

10.    Because "[d]isclosure is the pivotal concept in reorganization practice under the Bankruptcy Code," the disclosure statement serves a critical function in the bankruptcy process. 7 Collier on Bankruptcy ¶ 1125.02 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (citing H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 226–31 (1977), *reprinted in* App. Pt. 4(d)(i); In re Cyr Bros. Meat Packing, Inc., 2 B.R. 620, 626 (Bankr. D. Me. 1980)).  The "general purpose of the disclosure statement is to provide 'adequate information' to enable 'impaired' classes of creditors and interest holders to make an informed judgment about the proposed plan and determine whether to vote in favor of or against that plan."  In re Phoenix Petroleum Co., 278 B.R. 385, 392 (Bankr. E.D. Pa. 2001); see also In re Aspen Limousine Serv., Inc., 193 B.R. 325, 334 (D. Colo. 1996).  The Bankruptcy Code defines "adequate information" as

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan.

11 U.S.C. 1125(a)(1).  A disclosure statement should not be approved if it does not contain adequate information.  See Menard-Sandford v. Mabey (In re A.H. Robins Co., Inc.), 880 F.2d 694, 696 (4th Cir. 1989).

11.    Generally speaking, adequate information is determined on a case-by-case basis. Phoenix Petroleum Co., 278 B.R. at 392; In re Tex. Extrusion Corp., 844 F.2d 1142, 1157 (5th

Cir. 1988). However, courts have admonished that certain categories (or categories substantially similar) should be considered, including, among others:

a. A complete description of the available assets and their value;

b. The anticipated future of the debtor, with accompanying financial projections;

c. Information regarding claims against the estate, including those allowed, disputed, and estimated;

d. A liquidation analysis setting forth the estimated return that creditors would receive under chapter 7;

e. The accounting and valuation methods used to produce the financial information in the disclosure statement;

f. A summary of the plan of reorganization;

g. An estimate of all administrative expenses, including attorneys' fees and accountants' fees;

h. Any financial information, valuations or pro forma projections that would be relevant to creditors' determinations of whether to accept or reject the plan;

i. Information relevant to the risks being taken by the creditors and interest holders;

j. The actual or projected value that can be obtained from avoidable transfers;

k. The tax consequences of the plan; and

l. The relationship of the debtor with affiliates.

In re Oxford Homes, Inc., 204 B.R. 264, 269 n.17 (Bankr. D. Me. 1997) (citing In re Ferretti, 128 B.R. 16, 18-19 (Bankr. D.N.H. 1991)). The Debtors' Disclosure Statement fails to provide adequate information to creditors that would allow the creditors to make an informed decision about the consequences of their confirmation vote.

> **1. The Disclosure Statement Should Not Be Approved Because It Lacks Information Regarding the Debtors' Assets, Including Any Avoidance Actions, and Fails to Justify Its Projections**

12. Included in the above list of categories for adequate information considerations are (i) a description of the debtor's assets and their value and (ii) financial information regarding the debtors, including valuations and projections, that would be relevant to a creditor's

determination of whether to accept or reject the plan.  See In re Phoenix Petroleum Co., 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) (citing Metrocraft Pub. Servs., Inc., 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984)); In re Oxford Homes, Inc., 204 B.R. 264, 269 n.17 (Bankr. D. Me. 1997) (citing In re Ferretti, 128 B.R. 16, 18–19 (Bankr. D. N.H. 1991)).  When a disclosure statement is inaccurate or lacks an adequate factual basis in these areas, the court should not approve it.  In re Main St. AC, Inc., 234 B.R. 771, 775 (Bankr. N.D. Cal. 1999) ("The lack of meaningful financial information . . . hinders an informed judgment by the hypothetical reasonable investor, rendering the disclosure statement inadequate."); In re Reilly, 71 B.R. 132, 135 (Bankr. D. Mont. 1987) (denying approval of disclosure statement that inaccurately valued the debtors' real property).

13.     The Disclosure Statement fails to meet this standard because, even though the Debtors only have one material asset, nowhere in the Disclosure Statement do the Debtors disclose or provide any description of their assets or the value of any of their assets.  Because the Disclosure Statement provides that iStar's secured claim in the amount of $31,339,831.40 will be allowed in full as a secured claim, iStar can only assume that the Debtors' believe that the value of their sole material asset equals or exceeds $31,339,831.40.  (Disc. Stmt. at 6.)  However, nowhere in the Disclosure Statement do the Debtors provide any support for such valuation.

14.     The Disclosure Statement also fails to disclose whether the Debtors have any other property available for distribution to the Debtors' creditors, including whether the Debtors have evaluated the payments made by the Debtors preceding the bankruptcy filings and whether the Debtors intend to pursue any avoidance actions.[1]

---

[1]     The only mention of avoidance actions is in section 8.7 of the Plan, in which the Debtors merely preserve their rights with respect to all of the Debtors' alleged causes of action, including avoidance actions.

15.     The Disclosure Statement also fails to provide any discussion regarding the assumptions on which the projections attached as Exhibit B to the Disclosure are based. Specifically, the projections assume that (i) all of the shopping center leases are market leases, (ii) all of the tenants will renew their leases on the same terms, many of which leases are set to expire within the first few years following the effective date of the Plan, and (iii) the Debtors will not be required to make any tenant improvements during the life of the Plan. Yet the Disclosure Statement does not discuss these assumptions, the bases for these assumptions, or the risk underlying these assumptions.

16.     In addition to the Disclosure Statement failing to disclose the assumptions on which the projections are based, the projections themselves are flawed. Specifically, the projections do not account for iStar's over $6,000,000 unsecured deficiency claim (which is based upon an recent appraisal of the real property).[2] Given the proposed payment to the general unsecured claimants of 90% of their claims within five years of the effective date of the Plan (payable in equal, yearly installments) and the unaccounted for iStar general, unsecured deficiency claim, based upon the Debtors' own projections, the reorganized entity will not be able to pay unsecured creditors their proposed 90% recovery, unless the reorganized Debtors substantially increase their revenue, an insurmountable task given that the shopping center currently enjoys a 100% occupancy rate and its tenants are paying above-market rent.

17.     The Disclosure Statement also contains no description of the consequences to the Reorganized Debtor or to creditors of a default in the payment obligations set forth in the Plan.

---

[2] The recent appraisal valued the real property at $25,250,000. (See Mot. for Relief from Automatic Stay.)

18.     Before casting their ballots, creditors are entitled to know the type and value of the assets the Debtors propose to support and pay their claims, whether the Debtors will be likely to perform their Plan obligations, and what will happen if the Debtors once again default.

**2.      The Disclosure Statement Should Not Be Approved Because It Does Not Contain Sufficient Information Regarding the Debtors' Proposed Equity Structure or to Whom the Reorganized Debtors' Equity Interests Will Be Offered**

19.     The Disclosure Statement provides that the "Equity Interests shall be cancelled and new equity shall be issued for the payment of $1,000 each, or in an amount as the Court deems to be fair and equitable."  (Disc. Stmt. at 8.)  This single sentence description of the Debtors' post-confirmation equity structure is wholly inadequate on multiple fronts.  First, it does not allow a creditor or a hypothetical reasonable investor to evaluate the Debtors' post-confirmation ownership.  Information regarding the ownership of privately-held debtor post-confirmation is crucial to any creditor's determination regarding whether it will support a proposed Plan.[3]

20.     Additionally, the Disclosure Statement merely states that "new equity will be issued for the payment of $1,000 each."  It does not disclose (i) how the Debtors arrived at that amount, (ii) whether the proposed $1,000 purchase price is reasonably equivalent to the interest being received, (iii) whether "each" refers to a single membership or beneficial ownership interest in the Debtors, (iv) how many membership or beneficial ownership interests the Debtors propose to sell, (v) whether the new value is necessary for the Debtors' reorganization, (vi) how the Debtors will use the proceeds of the equity issuance or (vii) to whom and through what vehicle the new equity interests are being offered (i.e., whether only the Debtors' current equity

---

[3]      Other sections of the Plan appear to indicate that the equity interests will be distributed to the current owners and beneficiaries of the Debtors.  (See e.g., Disc. Stmt. at 9.)

interest holders have the right to purchase or whether there will be a more structured rights offering with an auction and bidding procedures).

21.     Before casting their ballots, creditors are entitled to know who the Debtors' owners may be and the details of the equity issuance, including whether the creditors themselves will have the option to acquire the ownership interests.

**3.      The Disclosure Statement Should Not Be Approved Because It Does Not Contain Information Sufficient to Assess the Plan's Feasibility and Does Not Disclose the Underlying Risks Associated with the Plan**

22.     Section 1129(a)(11) of the Bankruptcy Code requires a finding that the "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan." The purpose of the feasibility requirement is to prevent confirmation of a plan that has no reasonable prospect of success. The Disclosure Statement lacks (i) information sufficient to inform the Debtors' creditors regarding the feasibility of the proposed reorganization and (ii) adequate disclosure regarding the risks associated with the Debtors' Plan. Specifically, the Disclosure Statement fails to disclose the fundamental basis on which the success of the Plan is premised: the **hope** that the Debtors will be able to secure refinancing in five years when the balloon payment to iStar under the Plan becomes due. In the meanwhile, the reorganized entity will be insolvent on a balance sheet basis and likely on a cash flow basis,[4] a crucial fact the Disclosure Statement keeps silent. As discussed above, the Disclosure Statement also fails to discuss the assumptions on which the projections attached as Exhibit B to the Disclosure Statement are based.

---

[4]        Even if the Debtors' main asset is valued at the amount of iStar's secured claim, which iStar thinks would be inappropriate, the reorganized entity will have debts that exceed the value of its assets, calling into question whether the Debtors would be able to make the payments they promise in the Plan and Disclosure Statement.

23.     Given that the success of the Plan hinges on the Debtors' ability to obtain financing within five years of the effective date of the Plan, the Disclosure Statement should also provide adequate information regarding the Debtors' failed attempts during the two years prior to the Petition Date and during the pendency of these cases to obtain financing sufficient to refinance iStar's claim.  Rather, the only mention of the Debtors' inability to obtain financing is limited to the following: "[After Captain Van Dyke made a $1,000,000 cash payment to iStar in December 2008 to renew its loan with iStar], the capital markets collapsed around the country making it impossible for Captain Van Dyke to secure new financing prior to the September 2009 maturity date."[5]  (Disc. Stmt. at 13.)  This summary description, which does not describe the commitment offers that the Debtors received for refinancing, the loan amount contemplated in such offers, financial covenant requirements or term of such offers, fails to provide any basis on which the Debtors' creditors can reasonably determine whether sufficient financing may be available in five years to pay iStar's claim in full.

### 4.     The Disclosure Statement Cannot Be Approved Because It Does Not Contain Sufficient Information Regarding the Claims Against the Debtors' Estates

24.     The Disclosure Statement provides no information regarding the claims against the Debtors' estates.[6]  There is no disclosure of the number or amount of claims in each class.  In fact, the only mention of the amount of unsecured claims asserted against the estates is set forth in the liquidation analysis, which lists iStar's secured claim of $31,339,831.40, mechanics' liens claims of $67,489.39,[7] and general unsecured claims of $168,057.02.  Other than the amount of

---

[5]     The Disclosure Statement also, notably, fails to mention that Captain Van Dyke obtained the $1,000,000 to pay iStar in December 2008 from Mr. East's spouse and another beneficiary of the Captain Van Dyke Trust.

[6]     The description of Class 3 claims in the Disclosure Statement notes that the mechanics lien claims are approximately $40,639.37.  But this amount contradicts the amount set forth in the liquidation analysis.

[7]     See, *supra* note 6.

iStar's claim, these amounts are in direct conflict with the claim amounts in the Debtors' schedules and the claims registers in the Debtors' cases. Specifically, using the Debtors' schedules and the claims registers, the unsecured claims asserted against the Debtors' estates are closer to $1,000,000.[8] The Disclosure Statement and Plan should also provide information regarding the $4,500,000 secured claim filed against Treasure Chest, LLC, including whether the claim is disputed by the Debtors and the basis for such contention.

25. The disclosure regarding administrative claims and priority tax claims is also problematic insofar as the Plan does not discuss or provide any estimate of the amount of administrative claims or priority tax claims.

**5. The Disclosure Statement Should Not Be Approved Because It Does Not Disclose Compensation to Be Paid to the Debtors' Insiders Nor Does it Disclose the Treatment of any Insiders' Claims**

26. A "disclosure statement must describe fully, completely, and in detail all transactions with insiders. If there are no such transactions Debtors must so state." In re Malek, 35 B.R. 443, 444 (Bankr. E.D. Mich. 1983). The Disclosure Statement discloses that Clark D. East will continue to serve as the Trustee of the Captain Van Dyke Trust and as member of Treasure Chest, LLC, but it fails to disclose the compensation or other fees that will be paid to Mr. East as consideration for such services. (Disc. Stmt. at 9.)Moreover, the Disclosure Statement and Plan fail to address treatment of insider claims. The Disclosure Statement should identify all insiders and their claims,[9] all compensation paid during these cases or to be paid following the effective date of the Plan, and explain whether such claims will be subordinated and the reasons for such treatment.

---

[8] The Debtors scheduled an unsecured claim of $500,000 for Elaine S. East, an insider of the Debtors.

[9] There are at least two insider creditors, Mr. East's wife and his partner, Robert Brown. The Disclosure Statement says nothing about either.

6.    **The Disclosure Statement Should Not Be Approved Because the Liquidation Analysis Is Wholly Inadequate**

27.    In order to justify their proposed treatment of claims under the Plan, the Debtors attached a liquidation analysis to the Disclosure Statement as Exhibit A.  The liquidation analysis, however, is no analysis at all and does not provide any information, much less adequate information, regarding the liquidation value of the Debtors' assets.  Rather, it provides an unsupported conclusory assertion that none of the Debtors' creditors would fare better in a chapter 7 liquidation, which conclusion contradicts other assertions in the Disclosure Statement itself.  In fact, the liquidation analysis alleges that iStar would receive something less than its $31,339,831.40 in a chapter 7 liquidation.  However, by providing that iStar will have an allowed secured claim in the fully amount of $31,338,831.40, the Debtors have alleged that iStar's claim is fully secured.

7.    **The Disclosure Statement Should Not Be Approved Because It Does Not Provide Any Discussion of the Potential Tax Consequences of the Plan**

28.    Section 1125(a)(1) of the Bankruptcy Code requires a discussion of the potential material federal tax consequences of the Plan to investors and its effect on the Debtors.  The only mention of tax consequences in the Disclosure Statement is a statement asserting that the Debtors will not be liable for any taxes asserted by a governmental authority unless that authority has filed a claim against the respective Debtor. (Disc. Stmt. at 12.)  This discussion of tax claims does not satisfy the requirements of section 1125.

8.    **The Disclosure Statement May Not Be Approved Because The Plan Is Fatally Flawed and Not Confirmable**

29.    In addition to the adequate information requirement, courts agree that a disclosure statement should not be approved if the plan it describes is patently non-confirmable or fatally flawed.  In re Phoenix Petroleum Co., 278 B.R. 385, 394  (Bankr. E.D. Pa. 2001); In re Main St.

AC, Inc., 234 B.R. 771, 775 (Bankr. N.D. Cal. 1999); In re Curtis Ctr. Ltd. P'ship, 195 B.R. 631, 638 (Bankr. E.D. Pa. 1996); In re O'Leary, 183 B.R. 338, 339 (Bankr. D. Mass. 1995); In re 266 Washington Assocs., 141 B.R. 275, 288 (Bankr. E.D. N.Y. 1992); In re Filex, Inc., 116 B.R. 37, 40 (Bankr. S.D.N.Y. 1990); In re Century Inv. Fund VIII Ltd. P'ship, 114 B.R. 1003, 1005 (Bankr. E.D. Wis. 1990); In re S.E.T. Income Properties, III, 83 B.R. 791 (Bankr. N.D. Okla. 1988); In re Pecht, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986). As discussed below, the Plan is fatally flawed and not confirmable for several reasons. Therefore, the Disclosure Statement that describes the Plan may not be approved.

30.     Because the Debtors' Disclosure Statement fails to provide adequate information regarding critical aspects of the Debtors' businesses and assets, the Plan, and the assumptions underlying the Plan, and fails to provide an adequate liquidation analysis, the Disclosure Statement should not be approved on a final basis.

**B.      The Debtors' Plan is Not Confirmable.**

31.     To confirm a consensual chapter 11 plan, a plan proponent must satisfy all thirteen requirements of section 1129(a). If a plan proponent is unable to satisfy the requirement of section 1129(a)(8), which requires that all classes of claims and interests have either accepted the plan or are unimpaired, the plan proponent may seek nonconsensual confirmation under the "cram down" provisions of section 1129(b).

32.     The proponent of a plan has the burden of demonstrating compliance with each of the conditions and requirements of section 1129(b) by "clear and convincing evidence." See, e.g., In re Miami Ctr. Assocs., Ltd., 144 B.R. 937, 940 (Bankr. S.D. Fla. 1992); In re Rusty Jones, Inc., 110 B.R. 362, 373 (Bankr. N.D. Ill. 1990); In re Future Energy Corp., 83 B.R. 470,

481 (Bankr. S.D. Ohio 1988); In re Agawam Creative Marketing Assocs., Inc., 63 B.R. 612, 618-19 (Bankr. D. Mass. 1986); In re Stoffel, 41 B.R. 390, 392 (Bankr. D. Minn. 1984).

33.     "[I]n addition to the consideration of objections raised by creditors, the [c]ourt has a mandatory independent duty to determine whether the plan has met all of the requirements necessary for confirmation." Williams v. Hibernia Nat'l Bank (In re Williams)), 850 F.2d 250, 253 (5th Cir. 1988) (quoting In re Holthoff, 58 B.R. 216, 218 (Bankr. E.D. Ark. 1985) (internal quotations omitted)). If nonconsensual confirmation is requested, the court also must consider the plan in light of the facts and circumstances of the case in order to determine whether the plan is fair and equitable and does not discriminate with respect to dissenting classes. Fed. Savs. & Loan Ins. Corp. v. D & F Constr., Inc. (In re D & F Constr. Inc.)), 865 F.2d 673, 675 (5th Cir. 1989).

34.     For the reasons set forth below, the Plan is not confirmable under either section 1129(a) or section 1129(b).

**1.     The Plan is Not Confirmable Under Section 1129(a)**

**a.     The Plan Does Not Comply with the Applicable Provisions of the Bankruptcy Code as Required by Section 1129(a)(1)**

35.     Section 1129(a)(1) requires that a plan comply with the applicable provisions of the Bankruptcy Code. The Plan fails to comply with section 1129(a)(1) because it does not classify iStar's unsecured deficiency claim and because it improperly gerrymanders an impaired accepting class for purposes of section 1129(a)(10).

36.     On September 1, 2010, iStar filed its secured proofs of claim against the Debtors in the amount of $31,339,831.40. The Debtors have not objected to iStar's claims. As mentioned above, based upon a recent appraisal, the value of the real property is not more than $25,250,000. Accordingly, pursuant to section 506(a) of the Bankruptcy Code, iStar has a

bifurcated claim: the secured portion of the claim is $25,250,000 (the value of the collateral), and the unsecured portion of the claim is approximately $6,089,831.40. iStar has not made a section 1111(b) election.

37. Section 5.3 of the Plan acknowledges and classifies iStar's secured portion of the claim. However, the Plan must include and classify iStar's unsecured deficiency claim with the Class 5 general unsecured claims in the amount of $6,089,831.40.

38. Additionally, Class 4 separately classifies the general unsecured claim of Pappas, the Debtors' property manager. Although section 1122 of the Bankruptcy Code only prohibits placing dissimilar claims in the same class, Courts interpreting section 1122 have also discerned the following requirement of the section:

> Although the proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case, this discretion is not unlimited. "[T]here must be some limit on a debtor's power to classify creditors ... The potential for abuse would be significant otherwise." If the plan unfairly creates too many or too few classes, if the classifications are designed to manipulate class voting, or if the classification scheme violates basic priority rights, the plan cannot be confirmed.

Olympia & York Fla. Equity Corp v. Bank of N.Y. (In re Holywell Corp.), 913 F.2d 873, 880 (11th Cir. 1990) (quoting Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co., 800 F.2d 581, 586 (6th Cir. 1986) (internal citations omitted)); see also Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture), 995 F.2d 1274, 1279 (5th Cir. 1991) ("[O]ne clear rule that emerges from otherwise muddled caselaw on § 1122 claims classification: thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan.") (quoting In re U.S. Truck Co., 800 F.2d 581, 586 (6th Cir. 1986)); Travelers Ins. Co. v. Bryson Props., XVIII (In re Bryson Props., XVIII), 961 F.2d 496, 502 (4th Cir. 1992).

39. The Debtors' schedules reveal that as of the Petition Date, Pappas had a general, unsecured claim in the amount of $6,541.75. However, pursuant to this Court's order dated September 1, 2010 [Doc. No. 65], the Debtors were authorized to pay all amounts owed to Pappas, including all amounts arising prior to the Petition Date. Accordingly, it is highly unlikely that Pappas currently has a claim against the Debtors at all. Even if Pappas still has a claim, the Plan notes that the Debtors have assumed or will assume the Papas Management Agreement. As such, any amount owing to Pappas should not be classified at all, but should be included with the administrative claims. See Official Comm. of Unsecured Creditors Metalsource Corp. v. US. Metalsource Corp. (In re U.S. Metalsource Corp., 163 B.R. 260, 269 (Bankr. W.D. Pa. 1993) (citing NRLB v. Bildisco, 465 U.S. 413, 531 (1984)).

**2. The Plan Was not Proposed in Good Faith as Required by Section 1129(a)(3)**

40. Section 1129(a)(3) requires that a plan be proposed in good faith and not by any means forbidden by law. The Debtors have not proposed the Plan in good faith because (i) the Plan subverts the priority scheme of the Bankruptcy Code by permitting the most junior class to retain 100% of their interests in the Debtors with a nominal capital infusion, while only paying general unsecured creditors 90% of their claim, (ii) the Debtors' cases have been tainted from the original bad faith filing of the petitions, and (iii) the Plan improperly gerrymanders an impaired accepting class for purposes of section 1129(a)(10).

41. As discussed in detail below, the Plan was not proposed in good faith because it subverts the priority scheme of the Bankruptcy Code by permitting the most junior class, the Debtors' interest holders, to retain 100% of their interests in the Debtors in exchange for a mere $1,000, while only paying Class 5 General Unsecured Creditors 90% of their claims over a five year period. The Debtors' blatant violation the absolute priority rule by allowing its owners to

retain their property while calling on other creditors to sacrifice 10% (or more) of their claim is inconsistent with the objectives of the Bankruptcy Code and not an act of good faith.

42.     Compounding this affront, as detailed in iStar's Motion to Dismiss, the owners commenced these cases in order to retain control of and preserve 100% of the Debtors' equity interests, on the eve of foreclosure, when they knew they had no other means of delaying iStar from exercising its rights as secured party.   These actions have tainted the Debtors' cases and necessarily render any reorganization proposal, including the Plan, unconfirmable under section 1129 of the Bankruptcy Code.  Phoenix Piccadilly, Ltd. v. Life Ins. Co. of Va. (In re Phoenix Piccadilly, Ltd.), 849 F.2d 1393, 1395 (11th Cir. 1988) ("[A]s this Court stated in In re Natural Land: the taint of a petition filed in bad faith must naturally extend to any subsequent reorganization proposal; thus, any proposal submitted by a debtor who filed his petition in bad faith would fail to meet section 1129's good faith requirement. The possibility of a successful reorganization cannot transform a bad faith filing into one undertaken in good faith." (internal citations omitted)) (quoting Natural Land Corp. v. Baker Farms, Inc. (In re Natural Land Corp.), 825 F.2d 296, 298 (11th Cir. 1987)).

43.     Further evidence of the Plan's violation of the objectives of the Bankruptcy Code and the Debtor's bad faith due to the Plan's attempt to improperly gerrymander an impaired accepting class for purposes of section 1129(a)(10) is discussed in section 5 below.

**3.     The Plan is Not in the Best Interest of Creditors as Required by Section 1129(a)(7)**

44.     Section 1129(a)(7) requires that each holder of claim in a class that does not accept the plan:

> [R]eceive or retain under the plan on account of such claim or interest property of
> a value, as of the effective date of the plan, that is not less than the amount that

such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.

11 U.S.C. 1129(a)(7)(A)(ii). The so-called "best interest of creditors test" of section 1129(a)(7) is "one of the cornerstones of chapter 11 practice. It is an individual guaranty to each creditor or interest holder that it will receive at least as much in reorganization as it would in liquidation." 7 Collier on Bankruptcy, ¶ 1129.02[7].

45. If the Debtors were liquidated under chapter 7, iStar, on account of its secured claim, would immediately receive its collateral and would be able to liquidate it in a commercially reasonable and value maximizing way. Instead, under the Plan, the Debtors merely give iStar a hope note, with no express terms, covenants, representations, warranties, or reporting obligations, that they think – without any evidentiary or even anecdotal support – they can pay off in five years. Given the lack of feasibility of such a capricious plan, iStar's secured claim would fare better in a chapter 7 liquidation. Therefore, the Plan is not in the best interest of iStar as a secured creditor and cannot meet the requirement of section 1129(a)(7).

46. Moreover, the Plan proposes to pay iStar up to 90% of its unsecured claim over a five year period, while preserving any equity value that might be realized thereafter to the owners. iStar will suffer a substantial loss under the Plan, while the Debtors' owners will retain any appreciation in value of iStar's collateral over its currently depressed level. Such misappropriation is not in the best interest of iStar as an unsecured creditor, and cannot meet the requirement of section 1129(a)(7).

**4.    Not All of the Impaired Classes Will Accept the Plan**

47. Section 1129(a)(8) requires that each class of claims or interests either accept the plan or not be impaired under the plan. Class 2 (iStar's secured claim) and Class 5 (the general unsecured claims) are impaired under the Plan. iStar has voted to reject the Plan in both classes.

As described above, iStar's unsecured deficiency claim is approximately $6,000,000, which comprises nearly all of the total amount of claims in Class 5. iStar's rejection of the Plan, therefore, means that Class 5 has rejected the Plan under section 1126(c). Thus, both Classes 2 and 5 have rejected the Plan.

### 5. It is Unclear Whether Any Impaired Class Will Accept the Plan as Required by Section 1129(a)(10)

48. Section 1129(a)(10) provides that "[i]f a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). According to the Plan, there are four classes of impaired claims. As described above, both Classes 2 and 5 have voted to reject the Plan. The impaired Class 4 was gerrymandered by the Debtors to improperly create a class of impaired claims that may vote to accept the Plan, and as such, its vote should not be counted. Because Class 4 was improperly created and the Pappas claims constituting the Class 4 claims are likely administrative expenses rather than an unsecured claim against the Debtors, the Plan will not have an impaired accepting class unless Class 3 has voted to accept the Plan. Yet the classification of Class 3 should be scrutinized as well. The nominal secured mechanic's lien claim of $40,000 that comprises that class is not "sufficiently weighty" to be classified in its own class, and should not be given a controlling voice as to the confirmation of the Plan. See In re Curtis Center Ltd. P'ship, 195 B.R. 631, 640-41 (Bankr. E.D. Penn. 1996) (A "classification scheme must provide a reasonable method for counting votes. In a cramdown case, this means that each class must represent a voting interest that is [both] *sufficiently distinct and weighty* to merit a separate voice in the decision whether the proposed reorganization should proceed . . . . [The minor claims did] not represent a voting interest that [was] 'sufficiently weighty' to merit a separate, and possibly

controlling voice in a the fundamental decision of whether this proposed reorganization should proceed.") (quoting <u>John Hancock Mut. Life Ins. v. Route 37 Bus. Park Assocs.</u>, 987 F.2d 154, 159 (3d Cir. 1993)). Plus, under either iStar's valuation or that of the Debtors, there is no equity in the Debtors' sole asset for any creditor other than iStar. As a result, the sole member of Class 3, a mechanics' lienor, is nothing more than an unsecured creditor who should be classified as such.

49. When viewed in a proper light, the Debtors' Plan cannot be confirmed because the remaining impaired classes have not and will not vote in favor of the Plan.

**6.    The Plan is not Feasible as Required by Section 1129(a)(11)**

50. Section 1129(a)(11) sets forth the plan feasibility standard, and requires that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan." 11 U.S.C. § 1129(a)(11).

> Although a debtor need not guarantee the success of its plan, it must provide "reasonable assurance" that the plan can be effectuated. Factors to be considered by a court in its calculus of the feasibility of a debtor's plan include the debtor's prior performance, the adequacy of capital structure, the earning power of the business, economic conditions, the ability of management, and any other related matter that determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

<u>In re Atrium High Point Ltd. P'ship</u>, 189 B.R. 599, 609 (Bankr. M.D.N.C. 1995) (internal citations omitted). A plan is not feasible where it is nothing more than a pipe dream. It must demonstrate that there is a reasonable possibility that it will be successful.

51. In determining whether a proposed plan is feasible, courts consider a debtor's cash projections, which show the debtor's ability to make plan payments while also funding its operations. The debtor's "projections must be based on evidence of financial progress and must

not be speculative, conjectural, or unrealistic." F.H. Partner v. Investment of the Southwest, Inc. (In re Investment Co. of the Southwest, Inc.), 341 B.R. 298, 311 (10th Cir. 2006) (citing In re Trevarrow Lanes, Inc., 183 B.R 475, 482 (Bankr. E.D. Mich. 1995)). A debtor must proffer some evidence to explain how balloon payments will be reasonably funded at the time they become due. Id at 316.

52.     The Debtors, who will be insolvent upon emergence if their Plan were confirmed, propose to pay iStar's secured claim in full within 60 months following the effective date of the Plan. Accordingly, the success of the Debtors' Plan hinges on the Debtors obtaining financing within five years of the effective date of the Plan. The Debtors have not outlined any means of how they plan to seek and receive financing for a loan with a 100% loan to value ratio. Given that the Debtors have failed during the two years prior to the Petition Date to obtain financing sufficient to refinance iStar's claim, their ability to secure refinancing for their overleveraged real property is anything but certain and more realistically is simply not feasible.

53.     In addition, the Debtors' projection do not support the payment of 90% of the unsecured creditors' allowed claims (including iStar's deficiency claim) in equal yearly installments during the term of the Plan. Where the shopping center currently enjoys 100% occupancy rate and its tenants are paying above-market rent, it is implausible for the Debtors to meet their obligations under the Plan.

**B.      The Plan Is Not Confirmable under Section 1129(b)**

54.     A court may confirm (or cram down) a plan, despite the fact that the requirements of section 1129(a)(8) are not met, if all of the other requirements of section 1129(a) and the requirements of section 1129(b) are satisfied. However, even if the Plan did meet all of the

requirements of section 1129(a) other than section 1129(a)(8), the Plan is not confirmable pursuant to section 1129(b) because it is not fair and equitable.

## 1. The Plan Is Not Fair and Equitable

55. A plan must be "fair and equitable" with respect to each class of impaired claims that does not accept the Plan. <u>See</u> 11 U.S.C. § 1129(b)(1). In order to be "fair and equitable," a Plan must meet the requirements of section 1129(b)(2). Section 1129(b)(2)(A) provides the following minimum requirement for what fair and equitable treatment is for a class of secured claims:

> (i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

> (ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

> (iii) for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. § 1129(b)(2)(A).

56. Section 1129(b)(2)(B) provides the minimum requirement for what fair and equitable treatment is for a class of unsecured claims. An unsecured class must either (i) "receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim," 11 U.S.C. § 1129(b)(2)(B)(i), or (ii) "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property." 11 U.S.C. §

1129(b)(2)(B)(ii). The latter requirement is also known as the "absolute priority rule." See Travelers Ins. Co. v. Bryson Props., XVIII (In re Bryson Props., XVIII), 961 F.2d 496, 503 (4th Cir. 1992) ("[t]he absolute priority rule provides that 'a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property [under a reorganization] plan.'" (internal quotations omitted)) (quoting Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 202 (1988)).

57. The above-stated requirements are not exclusive and "are minimum requirements, and the court may consider a plan not fair and equitable even though it appears to meet the statutory requirements of that section." In re Miami Ctr. Assocs., Ltd., 144 B.R. 937, 940 (Bankr. S.D. Fla. 1992).

     **a.** **The Plan's treatment of iStar's secured claim is not fair and equitable**

58. The Plan does not meet the minimal standards of fair and equitable treatment for iStar's secured and unsecured claims. Specifically, the Plan does not satisfy section 1129(b)(2)(A)(ii) because no property is being sold pursuant to section 363. Additionally, the Plan does not provide iStar with the indubitable equivalent of its claim.

59. Rather, the Debtors attempt to meet the fair and equitable requirement with respect to iStar's secured claim by satisfying section 1129(b)(2)(A)(i) of the Bankruptcy Code and allegedly providing iStar with the present value of the amount of iStar's secured claim. Specifically, the Debtors propose to pay iStar in full, with monthly payments of principal and interest calculated at the rate of 5% per annum, amortized over 30 years and a balloon payment in five years.

60. As an initial matter, courts have refused to approve plans that extend the term of the secured loan significantly beyond the original term of the loan, which would create both

unfair risk to the creditor and unfairly defeat the creditor's expectations and state law rights against its collateral. See Fed. Savs. & Loan Ins. Corp. v. D & F Constr., Inc. (In re D & F Constr. Inc.), 865 F.2d 673 (5th Cir. 1989); see also 7 Collier on Bankruptcy ¶ 1129.04[2][a] n.18 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). Moreover, "a plan proposal to extend a matured, short-term loan over a substantially longer term is subject to particularly close scrutiny." In re Orchards Vill. Invs., LLC, No. 09-30893-fldll, 2010 WL 143706, at *20 (Bankr. D. Or. 2010) ("Although not per se objectionable, careful scrutiny must be given to a debtor's plan which proposes to convert a fully matured short term loan into permanent financing.") (quoting Imperial Bank v. Tri-Growth Centre City, Ltd. (In re Tri-Growth Centre City, Ltd.), 136 B.R. 848, 852 (Bankr. S.D. Cal. 1992)); In re Miami Ctr. Assocs., Ltd., 144 B.R. 937, 941 (Bankr. S.D. Fla. 1992) ("Debtor has not provided the Court with any authority that a loan in its ninth year of a ten year term can be stretched out for another ten years, where the current market for similar loans (as admitted by the debtor's expert) is only three to four years."); In re D & F Constr., Inc., 865 F.2d 673 (5th Cir. 1989)).

61.     In addition to the term being fair and equitable, the amount to be paid to the secured creditor must be sufficient to provide the secured creditor with the present value of its claim. In order to do so, "the amount of each installment must be calibrated to ensure that, over time, the creditor receives disbursements whose total present value equals to exceeds that of the allowed claim." Till v. SCS Credit Corp., 541 U.S. 465, 469 (2004). The Bankruptcy Code, however, is silent as to the method for determining the appropriate cram down interest rate.

62.     The Eleventh Circuit has held that the appropriate interest rate is the "prevailing market rate for a loan of a term equal to the payout period, taking into account the quality of the security and risk of subsequent default." U.S. v. S. States Motor Inns, Inc., (In re S. States Motor

<u>Inns, Inc.</u>, 709 F.2d 647, 651 (11th Cir. 1983). The Supreme Court, in holding that the formula approach is appropriate method for determining interest rate in a chapter 13 case, noted that in connection with a Chapter 11 case, it may be appropriate to ask what rate an efficient market would produce. <u>Till</u>, 541 U.S. at 477 n.14.

63.    The Sixth Circuit has interpreted the <u>Till</u> opinion, and particularly footnote 14, to support a market rate as the appropriate interest rate where there is an efficient market. <u>Am. Home Patient, Inc.</u>, 420 F.3d 559, 567 (6th Cir. 2006). Only where "no efficient market exists for a chapter 11 debtor . . . should [the bankruptcy court] employ the formula approach." <u>In re Winn-Dixie Stores, Inc.</u>, 356 B.R 239, 255 (Bankr. M.D. Fla. 2006) (discussing <u>Am. HomePatient</u>). Both <u>Till</u> and <u>American HomePatient</u> also acknowledge that objecting secured creditors should be compensated for their risk. <u>Till</u>, 541 U.S. at 480, <u>Am. HomePatient</u>, 420 F.3d at 569.

64.    When called upon to determine the prevailing market rate for a loan of an equal term and considering the quality of the security and the risk of default, the <u>Winn-Dixie</u> Court placed emphasis on the following: (1) the debtors went out into an efficient market and shopped for $720 million in post-petition financing; (2) the debtors received proposals from fourteen lenders; (3) the debt is secured by all of the debtors' assets, including the collateral of the objecting creditors; (4) the objecting creditors' loans would be senior to the exit financing loans; and (5) some exit lenders proposed an interest rate that was close to 7%. Based upon these facts and stressing that there was low risk of nonpayment, the court settled on a 7% interest rate. <u>See generally</u> <u>In re Winn-Dixie Stores, Inc.</u>, 356 B.R 239.

65.    In this case, the Debtors obtained a commitment from JPMorgan Chase earlier this year. JPMorgan, however, was only willing to advance $17,550,000, a fraction of the

amount owed to iStar with an interest rate <u>floor</u> of 6.85%, a maximum loan to value ratio of 70%, and a five year term. As noted above, the Debtors propose to pay iStar in full, with monthly payments of principal and interest calculated at the rate of 5% per annum, amortized over 30 years, with a balloon payment in five years, and a loan to value ratio of over 100%. The Debtors completely and inappropriately disregard critical risk factors that would drive the interest rate for the loan up including, among others, the 100% loan-to-value ratio, the creditworthiness of the borrower, the fact that rents are now above market and, over time, will normalize to a market level, or worse, and the length of the loan. All of those factors require an interest rate that is several percentage points higher than that proposed by the Debtors.

66.     Ultimately, the below market interest rate that the Debtors propose to pay to iStar under the Plan does not provide iStar with the present value of its claim, and as a consequence, the Plan does not satisfy section 1129(b)(2)(i).

> **b.     The Plan's treatment of iStar's general unsecured claim is not fair and equitable**

67.     The Plan proposes to pay its general unsecured creditors an amount equal to 90% of their allowed unsecured claim from a fund to be funded with the "net cash flow of the business operations after debt service and expenses, payable in five equal yearly payments, beginning one year from the Effective Date." (Plan § 5.6.1.) Because creditors in Class 5 will not receive an amount equal to their claim, the Plan does not meet the standard of section 1129(b)(2)(B)(i).

68.     The Plan also fails the absolute priority rule of section 1129(b)(2)(B)(ii). Despite the fact that the Debtors propose to only pay the general unsecured creditors 90% of their claims over a five year period, the Plan proposes to allow the current owners to retain their entire ownership interests in the Debtors. This treatment, which allows holders of interests junior to

Class 5 to retain 100% of their property, is a blatant violation of section 1129(b)(2)(B)(ii). In re Miami Ctr. Assocs., Ltd., 144 B.R. 937 (Bankr. S.D. Fla. 1992). Similar to the secured creditor in Miami Center Associates, the package of rights afforded to iStar under the Plan does not provide iStar with any upside potential. "That upside potential is going to the equity or residual claimants . . . . It is just the sort of attempted risk shifting that the absolute priority rule was intended to prevent." Id at 942.[10] Because the Plan only pays holders of Class 5 General Unsecured claims 90% of the amount of their claims, while allowing junior equity security holders to retain 100% of their property, the Plan fails to satisfy the minimal standard of fair and equitable treatment under section 1129(b)(2)(B), and is thus not confirmable under section 1129(b)(1).

### c. The Plan does not comply with the new value exception

69.     The "new value exception" is an exception to the absolute priority rule recognized by some courts that requires a certain type of capital infusion by the junior class in order to avoid the requirements of section 1129(b)(2)(B)(ii). More specifically, bankruptcy courts require that, in order for old equity holders to retain their interests in the Debtors, the capital contribution must be (a) new, (b) made in money or money's worth, (c) necessary for a successful reorganization, (d) substantial and reasonably equivalent to the value or interest being received, and (e) open to valuation by the market. In re Suncruz Casinos, LLC, 298 B.R. 833, 841 n.4 (Bankr. S.D. Fla. 2003). Additionally, "plans providing junior interest holders with exclusive

---

[10] The Miami Center court further stated that:

> In essence, from the debtor's perspective, the proposed new value is like putting money in the bank. The debtor's principals put the money in, and presumably the value of the hotel will increase which inure to the benefit of the debtor's principals (who may "withdraw" the increased value by selling the property in the future). In the meantime, the secured creditor, who bargained for a first lien position, runs the ultimate risk of the project's failure with no upside potential. Such a result is not fair and equitable and violates the absolute priority rule.

In re Miami Ctr. Assocs., Ltd., 144 B.R. 937, 940 (Bankr. S.D. Fla. 1992).

opportunities free from competition and without benefit of market valuation fall within the prohibition of § 1129(b)(2)(B)(ii)."  <u>Bank of Am. Nat'l Trust and Sav. Ass'n v. 203 North LaSalle St. P'ship</u>, 526 U.S. 434, 458 (1999).  In other words, the Supreme Court has made clear that the debtor's prepetition interest holders cannot have the exclusive right to bid on the equity in the reorganized debtor.

70.     In this case, the Debtors' old equity holders do not meet the requirements of the new value exception.  Specifically, although the $1,000 contribution is "new," it is not necessary for the reorganization.  In fact, the Plan is silent as to how the proceeds from the new value would be used by the Debtors as part of the implementation of the Plan.  Moreover, the contribution is clearly not substantial, nor is it reasonably equivalent to the interest being received, which is any upside potential of the reorganized debtor.

71.     The Debtors may argue that because the Plan provides that, "[i]f the Holders of Class 5 Claims have not been paid 90% of their Allowed Class 5 Claims at the end of the five-year term, the Equity Interest will make Cash contributions sufficient to fund the difference between the amount paid to date and fifty percent (50%) of the Allowed Class 5 Claims," sufficient new value has been provided.  (Plan at 17.)  However, "new value must be a present contribution rather than a promise to pay in the future, it must be freely tradable in the market by the debtor and it must be an asset in the accounting sense."  <u>Miami Ctr.</u>, 144 B.R. at 942.  As such, the promise to pay any outstanding amount to the general unsecured creditors five years after the Effective Date cannot constitute "new value" for purposes of the absolute priority rule.

72.     Because the Plan provides for a nominal "new value" capital contribution of $1,000 and because the old interest holders improperly maintain an exclusive right to make a

new value contribution pursuant to the Plan, the equity holders may not avail themselves of the new value exception, and the Plan violates the absolute priority rule.

## IV. CONCLUSION

73.     In the end, these chapter 11 cases are simply a two-party dispute between the Debtors and their secured lender, a dispute that had been resolved in the proper forum, the Florida state court.  The Debtors' proposed Plan underscores the Debtors' motives in filing their petitions within hours of the scheduled sale of the real property: to hinder the finalization of iStar's foreclosure of the Mortgage, to impede the sale of the real property, and to retain control of the real property.

## V. RESERVATION OF RIGHTS

74.     iStar hereby reserves its rights to object to any proposed modifications to the Plan or the Disclosure Statement whether proposed by the Debtors or any other party in interest, and expressly reserves its rights to supplement this Objection.

**WHEREFORE**, for the reasons stated above, iStar respectfully requests that this Court deny approval of the Disclosure Statement and deny confirmation of the Plan and grant such other and further relief that is just and proper.


Dated: October 25, 2010                             Respectfully submitted,
                                                     **JENNIS & BOWEN, P.L.**


                                                     By: ___Suzy Tate_____
                                                     David S. Jennis
                                                     Florida Bar No. 775940
                                                     Suzy Tate
                                                     Florida Bar No. 22071
                                                     Jennis & Bowen, P.L.
                                                     400 North Ashley Drive, Suite 2540
                                                     Tampa, Florida 33602

Phone: 813-229-1700
Fax: 813-229-1707

Peter A. Siddiqui
Karin H. Berg
Katten Muchin Rosenman LLP
525 W. Monroe Street
Chicago, IL 60661
Phone: 312-902-5623
Fax: 312-902-1061

*Co-Counsel for iStar FM Loan, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing *Objection to Confirmation* has been furnished, by electronic service and/or U.S. Mail, postage prepaid to the **United States Trustee**, 501 E. Polk St., Ste 1200, Tampa, FL 33602; **Russell M. Blain** and **Stephen R. Leslie**, 110 Madison Street, Suite 200, Tampa, FL 33602; **Debtor, Captain Van Dyke Trust,** c/o Clark D. East, Trustee, 10901 Corporate Circle North, Suite A, St. Petersburg, FL 33706; **Debtor, Treasure Chest, LLC,** c/o Clark D. East, 10901 Corporate Circle North, Suite A, St. Petersburg, FL 33706; and to those parties receiving electronic notices via this Court's CM/ECF system on this 25th day of October, 2010.

*/s/  Suzy Tate*
Suzy Tate